# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
December 8, 2015

Plaintiff-Appellee,

v

No. 323303
Crawford Circuit Court
LC No. 14-003686-FH

DANIEL FRANK WISENBAUGH,

Defendant-Appellant.

Before: SAAD, P.J., and STEPHENS and O'BRIEN, JJ.

PER CURIAM.

A jury convicted defendant of aggravated stalking, MCL 750.411i, for his violation of a personal protection order (PPO) obtained by the victim, his ex-girlfriend, when he appeared at her place of employment. He was sentenced as a habitual offender, third offense, MCL 769.11, to 43 months to 10 years in prison. Defendant appeals as of right, challenging the scoring of offense variables (OVs) 4, 8, and 10. We affirm.[1]

---

[1] In *People v Lockridge*, 498 Mich 358; ___ NW2d ___ (2015), our Supreme Court concluded that the legislative sentencing guidelines violate a defendant's Sixth Amendment fundamental right to a jury trial and are constitutionally deficient to the extent they require judicial fact-finding beyond facts admitted by the defendant or found by the jury to mandatorily increase the floor of the minimum sentence range. *Id*. at 364-365. However, the remedy for this constitutional violation is the severance of MCL 769.34(2) to the extent that it makes the guidelines mandatory. *Id*. The trial court must ascertain the applicable guidelines range and take it into account when imposing a sentence, but the guidelines are only advisory. *Id*. at 365. Consequently, a substantial and compelling reason is no longer required to depart from the guidelines range. *Id*. at 364-365. "[I]n cases in which a defendant's minimum sentence was established by application of the sentencing guidelines in a manner that violated the Sixth Amendment, the case should be remanded to the trial court to determine whether that court would have imposed a materially different sentence but for the constitutional error." *Id*. at 397. This procedure applies to both preserved and unpreserved errors. *People v Stokes*, ___ Mich App ___, ___; ___ NW2d ___ (2015) (Docket No. 321303), slip op at 11-12. "To make a threshold showing of plain error that would require resentencing, a defendant must demonstrate

-1-

Defendant and the victim knew each other for 6 ½ years and were involved in a romantic relationship. The victim asked defendant to leave her home, but he did not comply. Consequently, she evicted defendant from her residence and obtained a PPO against him on December 12, 2013. The PPO directed defendant not to appear at the victim's workplace or residence and not to approach or confront her in a public place or on private property. On January 30, 2014, the victim was at work when defendant called using his cell phone and indicated that he needed his tools. The victim instructed defendant not to call her and stated that she would call the police. Defendant persisted in calling her on the phone, but she did not answer. When the victim saw a telephone number that she did not recognize on the phone, she answered the phone only to find that defendant had acquired a different phone to call her. Defendant continued to call her, but she did not answer. The victim's foreman, David Auman, questioned why the victim was not answering the phone. He answered the phone, spoke to defendant, and instructed the victim to call the police.

Auman saw a man in a hoodie enter the building and proceed upstairs to the office. He was aware of the history between defendant and the victim and went to another area of the building to retrieve Andre Janisse, an employee familiar with defendant and the victim's tumultuous relationship, from a different location in the building. Walter Cramer had never met defendant, but could see from the business floor into the windows of the office where the victim and defendant were engaged in a struggle. Cramer started up the stairs when Auman came up from behind and yelled, "Go."

The victim felt safe at work because she did not think defendant would come there. She was in her office working when defendant suddenly appeared in front of her. Defendant said, "I want my tools. We need to talk." The victim tried to leave the office, but defendant blocked the door. She ran to the window and tried to get the attention of workers downstairs by hollering and waiving her arms because they wore ear plugs in light of the equipment. She went to the door and tried to place her arm in the way to prevent defendant from locking it. Defendant tried to push the office door shut as Cramer, Auman, and Janisse struggled to enter the office. The men managed to push their way into the office and stood between defendant and the victim. Despite their entry, defendant continued to attempt to get to the victim. Defendant cursed, threatened to hit Auman, and commented that the "one thing that would make the day better was a bullet." Eventually, the employees were able to calm defendant down, and he willingly went downstairs. A police officer arrived, spoke to the crying and scared victim, retrieved videotape from the surveillance system, and arrested defendant. Ultimately, the victim believed that defendant made 10 or 11 calls to her; she was scared of defendant, and no longer felt safe. The business had two different locations, and the shop employees did not normally work at the

that his or her OV level was calculated using facts beyond those found by the jury or admitted by the defendant and that a corresponding reduction in the defendant's OV score to account for the error would change the applicable guidelines minimum sentence range." *Id*. at 399. Here, defendant has not raised a Sixth Amendment *Lockridge* violation. Moreover, the trial court stated that it was "frustrated" by the guidelines range because a longer sentence was warranted in light of defendant's record and the need to protect the public, but it was constrained by the guidelines.

victim's office every day. There was the possibility she could have been alone when defendant came to her place of employment.

Defendant testified that he stayed at a motor lodge after being evicted from the victim's home. He did not have his tools or paperwork to resume his business. Consequently, he made a "desperate phone call" to the victim at work to retrieve his possessions. Defendant telephoned the victim twice, and she instructed him not to call her. He ran out of air time on his phone. He walked to the victim's father's home, that was located across the street from the victim's employer, to seek assistance in obtaining his tools, but the father was not home. After observing the victim's van at her work, defendant testified that he went there without any "malicious intent." He denied that the victim's arm was ever in the doorway. Rather, he stood in front of the door because three large men were coming after him. The men began to drag him out of the building, but he asked to walk out on his own. Defendant knew there was a PPO in effect and that he was not supposed to be there. However, he believed that his contact only constituted a misdemeanor subjecting him to jail time. Defendant acknowledged that he was previously convicted of aggravated stalking another woman, but denied that he stalked the victim. Despite his testimony, defendant was convicted as charged.

On appeal, defendant contends the sentencing guideline variables for OV 4, 8, and 10 were erroneously scored and a calculation in the appropriate lower range requires resentencing. We disagree. The circuit court's factual findings underlying the application of the sentencing guidelines are reviewed for clear error and must be supported by a preponderance of the evidence. *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). The facts, as applied to the statutory scoring conditions, present a question of law that an appellate court reviews de novo. *Id.*

OV 4 addresses psychological injury to a victim and 10 points is scored if "[s]erious psychological injury requiring professional treatment occurred to a victim." MCL 777.34(1)(a). Whether the victim seeks professional treatment is not conclusive with regard to scoring this variable. *People v Waclawski*, 286 Mich App 634, 681; 780 NW2d 321 (2009). A "victim's expression of fearfulness is enough to satisfy the statute." *People v Davenport (After Remand)*, 286 Mich App 191, 200; 779 NW2d 257 (2009). Additionally, a victim's indication that he no longer felt safe as a result of the crime was sufficient to support a score of 10 points for OV 4. *People v Gibbs*, 299 Mich App 473, 493; 830 NW2d 821 (2013). Here, the victim stated that her "heart quit beating" when defendant entered her office. She also testified that she previously felt that defendant would not approach her at work, but now she no longer felt safe there. Moreover, a number of witnesses substantiated that she reacted with fear. Therefore, 10 points was appropriate under OV 4. *People v Earl*, 297 Mich App 104, 109-110; 822 NW2d 271 (2012), aff'd on other grounds 495 Mich 33 (2014).

Fifteen points are assessed for OV 8 when a "victim was asported to another place of greater danger or to a situation of greater danger or was held captive beyond the time necessary to commit the offense." MCL 777.38(1); *People v Steele*, 283 Mich App 472, 490; 769 NW2d 256 (2009). Stalking is defined as "a willful course of conduct involving repeated or continuing harassment of another individual that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested and that actually causes the victim to feel terrorized, frightened, intimidated, threatened, harassed, or molested and that actually causes

the victim to feel terrorized, frightened, intimidated, threatened, harassed, or molested." MCL 750.411i(1)(e). Here, defendant's stalking charge was elevated to aggravated stalking because of the PPO. MCL 750.411i(2)(a). There is no requirement in either the crime of stalking or the crime of aggravated stalking that the defendant restrict the freedom of movement of the victim. Rather, defendant's arrival at the victim's place of work in violation of the PPO was sufficient to constitute aggravated stalking. Multiple witnesses testified that defendant blocked the door, prevented the victim from escaping, and hindered the employees from coming to her aid. The victim was thus held captive by defendant in her office before other employees were able to enter and remove defendant. The trial court did not err in scoring OV 8.

MCL 777.40 relates to the exploitation of a vulnerable victim. It provides, in relevant part:

> (1) Offense variable 10 is exploitation of a vulnerable victim. Score offense variable 10 by determining which of the following apply and by assigning the number of points attributable to the one that has the highest number of points:
>
> (a) Predatory conduct was involved……………………………. 15 points
>
> (b) The offender exploited a victim's physical disability, mental disability, youth or agedness, or a domestic relationship, or the offender abused his or her authority status.…………………………………………………. 10 points
>
> * * *
>
> (3) As used in this section:
>
> (a) "Predatory conduct" means preoffense conduct directed at a victim for the primary purpose of victimization.
>
> (b) "Exploit" means to manipulate a victim for selfish or unethical purposes.
>
> (c) "Vulnerability" means the readily apparent susceptibility of a victim to injury, physical restraint, persuasion, or temptation.

To be assessed under OV 10, a victim must have been both vulnerable and exploited. *People v Cannon*, 481 Mich 152, 158-159; 749 NW2d 257 (2008). Vulnerability "may arise not only out of a victim's characteristics, but also out of a victim's relationships or circumstances." *People v Huston*, 489 Mich 451, 464; 802 NW2d 261 (2011).

> Factors to be considered in deciding whether a victim was vulnerable include (1) the victim's physical disability, (2) the victim's mental disability, (3) the victim's youth or agedness, (4) the existence of a domestic relationship, (5) whether the offender abused his or her authority status, (6) whether the offender exploited a victim by his or her difference in size or strength or both, (7) whether the victim was intoxicated or under the influence of drugs, or (8) whether the victim was asleep or unconscious. The mere existence of one of these factors

-4-

does not automatically render the victim vulnerable. [*Cannon*, 481 Mich at 158-159 (footnotes omitted).]

Further, a defendant's predatory conduct alone "can create or enhance a victim's 'vulnerability.'" *Huston*, 489 Mich at 468. "[C]onduct directed at a victim for the primary purpose of victimization inherently involves some level of exploitation." *Cannon*, 481 Mich at 159.

Here, the victim was vulnerable. Defendant exploited his previous relationship because he utilized his knowledge of her work and routine. Although he represented that the contact was his desperate attempt to retrieve his tools, the tools were not stored at the victim's place of employment, but rather, at her home. Further, defendant exploited his difference in size and strength when he blocked the victim's retreat from her office. The victim noted that she considered her place of work a sanctuary and did not believe defendant would bother her there even if he might appear at her home. However, the victim also explained that there were times when the employees worked at the other shop location and she was alone, or the employees were present, but could not hear her because they wore earplugs while working. The record supports the conclusion that defendant sought the victim out in an area where he knew she would be present and where she could not easily escape because she was working. Considering all the factors, we conclude that the victim was vulnerable. Defendant sought to manipulate the victim for his own selfish purposes beyond mere stalking.

As noted, predatory conduct is defined as "preoffense conduct directed at a victim for the primary purpose of victimization." MCL 777.40(3)(a). The OV is scored 15 points only for "those forms of 'preoffense conduct' that are commonly understood as being 'predatory' in nature, e.g., lying in wait and stalking, as opposed to purely opportunistic criminal conduct or 'preoffense conduct involving nothing more than run-of-the-mill planning to effect a crime or subsequent escape without detection.'" *Huston*, 489 Mich at 462, quoting *Cannon*, 481 Mich at 162. "[T]o be considered predatory, the conduct must have occurred before the commission of the offense." *Cannon*, 481 Mich at 160. The conduct must have also been "directed at the person for the primary purpose of causing that person to suffer from an injurious action or to be deceived." *Id*. at 161. Where the purpose of preoffense conduct "is *other than* making the potential victim an actual victim" then it is not predatory. *Id*. at 162 (emphasis added). The statute does not require that "the defendant's preoffense predatory conduct have been directed at one particular or specific victim, but instead as requiring only that the defendant's preoffense predatory conduct have been directed at a victim." *Huston*, 489 Mich at 459. The timing and the location of the conduct may serve as evidence of preoffense predatory conduct. *People v Witherspoon (After Remand)*, 257 Mich App 329, 336; 670 NW2d 434 (2003). The context of the conduct, such as investigating the location and waiting for the victim to be alone, may be evidence of predatory conduct. *People v Kosik*, 303 Mich App 146, 160; 841 NW2d 906 (2013).

Here, defendant objected to the 15-point score for OV 10, asserting that the phone calls and visit were for the legitimate purpose of obtaining the return of his tools. The prosecutor noted that the PPO did not prohibit phone calls, the calls constituted predatory preoffense conduct, defendant did not have a legitimate belief that his property was at the victim's workplace, and therefore, his conduct was designed to destroy the victim's peace of mind at the workplace. The trial court concluded that defendant was aware of the victim's weaknesses and

vulnerability in light of their prior relationship, there was no evidence that defendant's property would be found at the victim's office, and defendant's statement that his conduct merely would impose jail time for a PPO violation demonstrated that he conducted a preoffense evaluation before terrorizing the victim, warranting the 15-point score.

In light of the record evidence, we cannot conclude that the trial court clearly erred in scoring OV 10 at 15 points. *Hardy*, 494 Mich at 438. The PPO prohibited defendant from appearing at the victim's workplace or residence; it did not prohibit contacting the victim by telephone. The victim initially answered defendant's phone call, but instructed him to stop calling her and she would call the police. When the victim stopped answering calls from defendant's phone number, he acquired a different phone with a number she did not recognize and persisted in calling. Although defendant represented that his decision to contact the victim at work was designed to obtain his tools and save his business, he knew Auman and was friends with Janisse, but he did not make contact with them and ask that they mediate the tool dispute. Rather, he walked into the business with his hoodie over his head and proceeded into the victim's office where he attempted to lock the victim in the office with him. The victim testified that the shop employees did not work in the same location every day, and it was possible that she could have been alone. These facts refute the assertion that defendant engaged in conduct simply to obtain the return of his tools and support the trial court's score for this variable.

Affirmed.

/s/ Henry William Saad
/s/ Cynthia D. Stephens
/s/ Colleen A. O'Brien

-6-