*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

FRANKLIN EDWIN HERRON,

        Defendant-Appellant.

UNPUBLISHED
March 14, 2024

No. 364434
Van Buren Circuit Court
LC No. 2021-022903-FH

Before: SWARTZLE, P.J., and REDFORD and YATES, JJ.

PER CURIAM.

Defendant, Franklin Edwin Herron, appeals by right his jury convictions of four counts of second-degree criminal sexual conduct (CSC-II), MCL 750.520c(2)(b) and MCL 750.520c(1)(b).[1] The trial court sentenced defendant to 86 months to 15 years' imprisonment for each CSC-II conviction. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The jury found defendant guilty of sexual assaults of three minor girls: MS, KS, and AI. Defendant is KS's uncle and AI's great-uncle by marriage. MS is not biologically related to defendant but a childhood friend of AI. Beginning in 2009, KS and AI spent time at defendant's house including sleepovers. MS met AI in 2011 and began spending nights at defendant's house as well.

KS testified that defendant sexually touched her in 2008 when she was seven years old. While she and defendant watched television on the couch together in a spooning position, defendant "started to rub my stomach up above my shirt. And then he glided his hand farther down and he glided his hand underneath my—my underwear and touched my pubic region." That caused

---

[1] The jury acquitted defendant of one count of CSC-I, MCL 750.520b(2)(b).

-1-

KS to feel very uncomfortable so she left and went into the bathroom to cry. Defendant testified that this incident never happened.

MS testified she joined a dance team run by defendant's wife and began having regular sleepovers at defendant's house. She grew to trust him. MS testified that defendant sexually touched her in 2012 when she was 10 years old. She and defendant were alone watching a movie on the couch in a spooning position and he began rubbing her stomach in "circular motions," something that he usually did to comfort her "nearly every time we cuddled on the couch together, which was almost every weekend." She testified that before this incident, on other occasions, defendant rubbed her belly under her shirt and had moved his hand below her underwear line. Each time defendant went a bit lower to the point where he rubbed the area where pubic hair would grow. MS testified that on one night, however, defendant moved his hand beneath her underwear to her vagina, put his fingers between her labia and rubbed her clitoris. After a while he asked her if it was okay a couple times, and when she said no, he stopped. She disclosed the incidents to her therapist in 2017 and then to law enforcement. MS testified that the sexual abuse impacted her tremendously.

AI testified that defendant first sexually touched her in 2014 when she was 13 years old. While in the car with defendant he began "grabbin' my legs and rubbin' up and down. And he began to ask me if I ever thought about him when I masturbated." She testified that when they arrived at defendant's house, he forced her to straddle him on the couch and kissed her. Defendant testified that it never happened. AI testified that another time defendant sexually touched her in early 2015, when she was 14 years old. While defendant tucked her in at night, something he often did, he forced her legs apart and rubbed her vagina. Defendant continued until she "yelled stop," and then he left the room. Defendant denied that this happened.

The jury found defendant guilty of four counts of CSC-II and acquitted him of one count of CSC-I. For defendant's four CSC-II convictions, the trial court calculated defendant's minimum sentencing guidelines range of 36 to 71 months. The trial court sentenced defendant to 86 months to 15 years' imprisonment.

Defendant argues that the trial court erred (1) by failing to instruct the jury with a specific unanimity instruction and trial counsel provided ineffective assistance by not requesting one; (2) by sentencing defendant based on an Offense Variable (OV) 10 score of 15 points for his CSC-II convictions and trial counsel provided ineffective assistance by not objecting to OV 10 scoring; and (3) trial counsel provided ineffective assistance by not objecting to the inclusion of acquitted conduct information in defendant's presentence investigation report (PSIR).

II. JURY INSTRUCTIONS

Relying on *People v Cooks*, 446 Mich 503, 511; 521 NW2d 275 (1994), defendant argues that he was entitled to a specific unanimity instruction because the separate acts of CSC on which the jury was instructed involved alternative factual situations that had "materially distinct proofs," and therefore, the trial court plainly erred by not instructing the jury that it must unanimously agree on *which* acts were proven beyond a reasonable doubt. Alternatively, defendant argues that he was denied effective assistance of counsel because his trial counsel failed to request a specific unanimity instruction. Defendant's arguments lack merit.

We review claims of instructional error de novo. *People v Kowalski*, 489 Mich 488, 501; 803 NW2d 200 (2011). We review "for an abuse of discretion a trial court's determination that a specific instruction is inapplicable given the facts of the case." *People v Hartuniewicz*, 294 Mich App 237, 242; 816 NW2d 442 (2011). However, because this issue was not preserved for appeal, we review it for plain error affecting defendant's substantial rights. See *People v Coy*, 258 Mich App 1, 12; 669 NW2d 831 (2003).

> First, there must be an error; second, the error must be plain (i.e., clear or obvious); and third, the error must affect substantial rights (i.e., there must be a showing that the error was outcome determinative). Moreover, reversal is warranted only when plain error resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings, independent of guilt or innocence. [*Id.* (citation omitted).]

"Whether a person has been denied effective assistance of counsel is a mixed question of fact and constitutional law. A judge first must find the facts, and then must decide whether those facts constitute a violation of the defendant's constitutional right to effective assistance of counsel." *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). Because defendant has not raised the issue of ineffective assistance of counsel before the trial court, our "review of this issue is limited to mistakes apparent on the record." *People v Jackson*, 292 Mich App 583, 600; 808 NW2d 541 (2011).

The Michigan and United States Constitutions both provide criminal defendants a constitutional right to a unanimous jury verdict. See US Const, Ams VI; Const 1963, art 1, § 14; *People v Gadomski*, 232 Mich App 24, 30; 592 NW2d 75 (1998). "In order to protect a defendant's right to a unanimous verdict, it is the duty of the trial court to properly instruct the jury regarding the unanimity requirement." *Cooks*, 446 Mich at 511. Generally, in cases "where materially identical evidence is presented with respect to each act, and there is no juror confusion, a general unanimity instruction will suffice." *Id*. at 512-513.[2]

A *specific* unanimity instruction, on the other hand, instructs the jury that "it must unanimously agree on the same specific act" if "the prosecution offers evidence of multiple acts by a defendant, each of which would satisfy the *actus reus* element of a single charged offense." *Gadomski*, 232 Mich App at 30. For example, the Model Criminal Jury Instructions for unanimity of a verdict on premeditated and felony murder states: "If you return a verdict of first-degree murder, your unanimous verdict must specify whether all of you have found the defendant guilty of: (a) premeditated murder, or (b) felony murder, or (c) both." M Crim JI 16.25. A specific unanimity instruction must be given if: "1) the alternative acts presented as evidence are *conceptually distinct* or there are *distinct proofs* regarding each alternative, or 2) other factors are present that create a genuine possibility of juror confusion or disagreement." *Cooks*, 446 Mich at 519 (emphasis added). In determining whether a specific unanimity instruction is required, the

---

[2] An example of a *general* unanimity instruction given after listing the elements of all the charges in a case is as follows: "A verdict in a criminal case must be unanimous. In order to return a verdict, it is necessary that each of you agree upon that verdict." *Id*. at 509.

"critical inquiry is whether either party has presented evidence that *materially distinguishes* any of the alleged multiple acts from the others." *Id.* (emphasis added).

In this case, the trial court instructed the jury that each count of CSC related to a specific victim. After providing the elements of all charges against defendant, the trial court instructed the jury with the following general unanimity instruction: "A verdict in a criminal case must be unanimous. In order to return a verdict, it is necessary that each of you agrees on that verdict." The trial court also instructed the jury to "consider each crime separately in light of all the evidence in the case."

The acts presented as evidence of defendant's CSC-II charges were not "conceptually distinct," and "distinct proofs" were not provided for each alternative charge. See *Cooks*, 446 Mich at 519. Rather, the prosecution presented materially identical evidence respecting each act, and therefore, the general unanimity instruction provided by the trial court sufficed. *Id.* at 512-513. The trial court instructed the jury separately as to each count of CSC-II. Count 1 related to KS, and the elements of the CSC-II crime were:

> First, that the Defendant intentionally touched [KS's] genital area, groin, inner thigh, buttock, or breast or the clothing covering those areas. Second, that this was done for sexual purposes or could reasonably be construed as having been done for sexual purposes. Third, that [KS] was less than 13 years old at the time of the alleged act. Fourth, that the Defendant was 17 years of age or older when the offense occurred.

The prosecution presented KS's testimony that when she was seven years old, defendant rubbed her stomach and sexually touched her pubic region while she was lying on the couch with him. Count 2 related to MS, and the elements of the CSC-II crime were identical with Count 1. The evidence presented to prove this count beyond a reasonable doubt, however, featured MS's testimony that, when she was 10 years old, defendant frequently rubbed her stomach while they were lying on the couch together, and he moved his hand below her underwear line.

Count 3 and Count 4 related to AI, and the elements of the CSC-II crime were identical:

> First, that the Defendant intentionally touched [AI's] genital area, groin, inner thigh, buttock, or breast or the clothing covering those areas. Second, that this was done for sexual purposes or could reasonably be construed as having been done for sexual purposes. Third, that [AI] was 13, 14, or 15 years old at the time of the alleged act. Fourth, that [AI] and the Defendant are related, either by blood or by marriage, as niece and uncle or great-niece and great-uncle.

AI testified that defendant is her great-uncle by marriage and that, when she was 13 years old, he forcibly kissed her and asked her to straddle him. She testified further that, when she was 14 years old, defendant forced her legs apart while he tucked her in bed at night and began to rub her vaginal area.

Although each act was proved distinctly from the others with different instances of sexual assault, the acts were not conceptually distinct; all the acts were part of the same theory that defendant committed criminal sexual conduct against the three victims. See *id.* This Court

explained in *Gadomski*, 232 Mich App at 31, that "it is well settled that when a statute lists alternative means of committing an offense, which means in and of themselves do not constitute separate and distinct offenses, jury unanimity is not required with regard to the alternate theories." Therefore, the elements listed in MCL 750.520c constitute alternative means of proving a single CSC-II offense. As this Court reasoned in *Gadomski*, 232 Mich App at 31, a defendant is properly convicted of CSC-II "even if some of jurors believed that he committed the offense solely based on one aggravating circumstance, while the rest of the jurors believed that he committed the offense based on another one of the aggravating circumstances." In this case, the trial court did not plainly err by giving the general unanimity instruction.

Defendant's reliance on *People v Yarger*, 193 Mich App 532; 485 NW2d 119 (1992), is misplaced. Defendant argues that in *Yarger*, "the defendant was charged with a single count of criminal sexual conduct and was convicted based on testimony alleging multiple acts," and that because the *Yarger* Court concluded that the defendant was entitled to a specific unanimity instruction, we should find the same. However, this case is distinguishable from *Yarger* because defendant was *charged with four counts* of CSC-II and one count of CSC-I, and the jury convicted him of four counts of CSC-II based on testimony regarding at least five separate acts; defendant was not charged with only a single count of CSC and convicted based on testimony alleging multiple acts.

Defendant argues that unlike *Cooks*, in which the defendant's acts were "indistinguishable and were not rebutted with different evidence," in this case, "the acts were distinguishable and rebutted with different evidence," entitling defendant to a specific unanimity instruction. This argument is a misstatement of the law. In *Cooks*, 446 Mich at 528-529, our Supreme Court stated that the defendant had no factual basis for a specific unanimity instruction because the defendant "did not present a *separate defense* or offer *materially distinct evidence* of impeachment regarding any particular act. He merely denied the existence of any inappropriate behavior. Thus, the sole task of the jury was to determine the credibility of the victim with respect to the pattern of alleged conduct." (Emphasis added.) The Court did not state that the defendant failed to present *different evidence*. Like the defendant in *Cooks*, defendant did not present a separate defense for any act; he merely denied throughout his testimony the existence of inappropriate behavior. Although defendant offered *different* evidence to rebut each particular act, this evidence was not *materially distinct* because it was all offered to support his sole defense. Moreover, nothing in the record indicates juror confusion or disagreement related to defendant's CSC charges.

Defendant was not entitled to a specific unanimity instruction; and by not requesting such instruction, his trial counsel did not violate defendant's constitutional right to effective assistance of counsel. See *LeBlanc*, 465 Mich at 579. "Trial counsel cannot be faulted for failing to raise an objection or motion that would have been futile." *People v Fike*, 228 Mich App 178, 182; 577 NW2d 903 (1998). Accordingly, defendant is not entitled to a new trial.

### III. SENTENCING

Defendant argues that the trial court improperly assessed 15 points for OV 10 because he did not engage in predatory conduct directed at KS, AI, or MS under the definition provided in *People v Cannon*, 481 Mich 152, 160-161; 749 NW2d 257 (2008), and therefore, the trial court based his sentence on an inappropriately inflated minimum sentencing guidelines range.

Alternatively, defendant argues that his trial counsel provided him ineffective assistance by failing to object to the assessment of 15 points for OV 10 during defendant's sentencing hearing. We disagree.

The trial court's factual determinations regarding the OVs must be supported by a preponderance of the evidence. *People v Osantowski*, 481 Mich 103, 111; 748 NW2d 799 (2008). We review the trial court's factual determinations at sentencing for clear error. *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). "A finding of fact is clearly erroneous if, after a review of the entire record, an appellate court is left with a definite and firm conviction that a mistake has been made." *People v Antwine*, 293 Mich App 192, 194; 809 NW2d 439 (2011) (quotation marks and citation omitted). "Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo." *Hardy*, 494 Mich at 438.

Minimum sentences that depart from the guidelines range are reviewed for reasonableness. *People v Lockridge*, 498 Mich 358, 365; 870 NW2d 502 (2015). Appellate review of departure sentences for reasonableness requires determination whether the trial court abused its discretion by violating the principle of proportionality set forth in *People v Milbourn*, 435 Mich 630; 461 NW2d 1 (1990). *People v Steanhouse*, 500 Mich 453, 477; 902 NW2d 327 (2017). Because defendant did not raise the issue of ineffective assistance of counsel before the trial court, our "review of this issue is limited to mistakes apparent on the record." *Jackson*, 292 Mich App at 600.

We review departure sentences for reasonableness by determining "whether the trial court abused its discretion by violating the 'principle of proportionality' . . . 'which requires sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender.' " *Steanhouse*, 500 Mich at 459-460, quoting *Milbourn*, 435 Mich at 636. See also *Graham v Florida*, 560 US 48, 59; 130 S Ct 2011; 176 L Ed 2d 825 (2010). Sentencing courts should ensure that the "sentences imposed across the discretionary range are proportionate to the seriousness of the matters that come before the court for sentencing." *Milbourn*, 435 Mich at 651. To determine whether a sentence is "proportional," the court "must take into account the nature of the offense and the background of the offender." *Id*. The *Milbourn* Court emphasized that trial courts should not apply their "own philosophy of sentencing," but rather determine where the defendant's case falls on a scale of the "least to the most serious situations," and impose a sentence based on that determination. *Id*. at 654.

The sentencing guidelines are advisory only, but trial courts must still consider the guidelines when imposing a sentence. *Lockridge*, 498 Mich at 365, 391-392. Trial courts "may continue to depart from the guidelines when . . . the recommended range under the guidelines is disproportionate, in either direction, to the seriousness of the crime." *Milbourn*, 435 Mich at 657. However, if the trial court imposes a departure sentence that is "unsupported by reasons not adequately reflected in the guidelines variables," it may be possible that the trial court "abused its discretion" in sentencing the defendant. *Id*. at 658, 659-660. To determine whether a sentence outside the guidelines range is more proportionate than a sentence within the guidelines, the court may consider "(1) whether the guidelines accurately reflect the seriousness of the crime; (2) factors not considered by the guidelines; and (3) factors considered by the guidelines but given inadequate weight." *People v Dixon-Bey*, 321 Mich App 490, 524-525; 909 NW2d 458 (2017) (quotation marks and citations omitted). If the trial court sentenced defendant based on a scoring error that

altered the minimum sentencing guidelines range, defendant is entitled to resentencing. See *People v Francisco*, 474 Mich 82, 88-91; 711 NW2d 44 (2006).

OV 10 applies to the offense categories of crimes against a person. MCL 777.22(1). MCL 777.40 defines the conduct that requires assessing points for OV 10 and states in pertinent part as follows:

> (1) Offense variable 10 is continuing pattern of criminal behavior. Score offense variable 10 by determining which of the following apply and by assigning the number of points attributable to the one that has the highest number of points:

> (a) Predatory conduct was involved ........................................... 15 points

> (b) The offender exploited a victim's physical disability, mental disability, youth or agedness, or a domestic relationship, or the offender abused his or her authority status .................................................................... 10 points

> (c) The offender exploited a victim by his or her difference in size or strength, or both, or exploited a victim who was intoxicated, under the influence of drugs, asleep, or unconscious ....................................................... 5 points

> (d) The offender did not exploit a victim's vulnerability . . . . . . . . . 0 points

MCL 777.40(3)(a) defines "predatory conduct" as "preoffense conduct directed at a victim . . . for the primary purpose of victimization." See also *Cannon*, 481 Mich at 157. Criminal conduct that is "purely opportunistic" is not predatory conduct. *People v Huston*, 489 Mich 451, 462; 802 NW2d 261 (2011). Rather, predatory conduct is conduct that occurred and was directed at the victim *before* the offense was committed for the primary purpose of making the potential victim an actual victim. *Cannon*, 481 Mich at 160-161.

In this case, the Michigan Department of Corrections reported in defendant's PSIR a detailed statement of the underlying facts reported to law enforcement officers that led to defendant's arrest and the charges for which he stood trial and was convicted. The PSIR explained the recommended assessment of points for OV 10 as follows:

> Each [victim] also told the writer that the defendant would gain their trust with hugs and kisses—actions that they did not fully understand were not appropriate when they were at young ages. They also reported to the writer that he would take them on day trips such as the zoo, purchase them gifts such as stuffed animals and give them candy. He would then also request and lure them to a couch to watch movies–possibly pornography–so that he could inappropriately touch them. The defendant would also engage them in conversations not appropriate for children such as masturbation. These actions were predatory in nature as they were pre-offense conduct designed to make the victims vulnerable to his sexual attacks and an OV10 score of 15 points for predatory conduct [is suggested].

\* \* \*

The defendant took advantage of very young girls for his sexual gratification. He engaged in inappropriate conversations with them, lured them with gifts and day trips and kissed and hugged them so much that at the time they came to understand it to be normal behavior. His actions demand public protection.

The evidence at trial established the facts reported in the PSIR. The victims each testified regarding defendant's acts that groomed them over time to gain their trust before he sexually abused them. That evidence demonstrated that the primary purpose of defendant's conduct served to make his potential victims his later actual victims. *Cannon*, 481 Mich at 160-161.

During defendant's sentencing hearing, the trial court stated that it recognized that defendant's sentence would be reviewed for reasonableness and that it must adhere to the principle of proportionality. The trial court offered multiple reasons for the extent of the departure sentence imposed, including the inadequacy of OV 10:

> I find, too, that each one of these factors standing alone support the departure sentence I intend to impose. First, the relationship between [defendant] and his victims. The testimony established that his home became what was supposed to be a respite for his victims. He was an uncle to one of them and others viewed him as such.

> They spent many nights and weekends. He became a home away from home, and, for at least one of the victims, the only home. The victims testified to having strong feelings of affection and admiration for him like one would have for a trusted family member, such as an uncle.

> That he completely shattered that trust is inadequately considered in the guidelines. To the ex—extent offense variable ten could be deemed as accounting for this, it does so insufficiently in this case.

> * * *

> I'm also required to expla—ain why the particular sentence I intend to propose is more proportionate to the offense and the offender than is a sentence within the guideline range. Defendant has been calculated at prior record variable C on P-R-V's. His offense varials—variables put him in level five.

> The considerations I've noted today all relate to offense variables that I conclude were either not addressed or were inadequately addressed . . . it seems more than reasonable to look at the next offense variable range above where descendants—Defendant sits in determining a proportionate sentence.

> If Defendant were to fall in offense variable six level, he'd have an advisory range of 43 to 86 months. I am guided by that range and imposing my particular sentences today and I conclude as well that a guideline at the top of that range is most proportionate to these offenses and this offender.

A preponderance of the evidence established that defendant's conduct falls squarely within the statutory definition of predatory conduct. Defendant argues that hugging and kissing the victims, taking them to the zoo, and watching movies together is normal, nonpredatory behavior. Under ordinary circumstance, such behavior would be normal, but the evidence in this case established that defendant used such to lure his victims into a sense of security and trust, and then he abused that trust by sexually assaulting each one of them. The testimony of KS, AI, and MS demonstrated that his conduct gradually progressed over time and constituted preoffense conduct that defendant directed at his victims for the primary purpose of eventually making them victims of his sexual assaults. See *Huston*, 489 Mich at 462; *Cannon*, 481 Mich at 160-161.

KS testified that, as a child, she saw defendant very often, that sometimes they were left alone together and that during one of those times, defendant rubbed her stomach while they watched television, something he had done on other occasions, and eventually moved his hand to touch her pubic region. MS testified that she and defendant cuddled on the couch together almost every weekend and that defendant usually rubbed her stomach in circular motions while they cuddled. She testified that sometimes defendant moved his hand below her underwear line, just above her vaginal area. MS also testified that she and AI would often cuddle with defendant on the couch and that the cuddling took place with defendant sitting "on the couch with his back against the armchair, kind of like this (gestures) and then . . . his legs would be spread and either me or . . . [AI] would be sitting or laying in between his legs."

AI testified that she and defendant often went on car rides to look at houses together, and later, on one of those car rides, defendant began to inappropriately touch her legs and ask her questions about masturbation. After they returned home, defendant forced her to straddle him and kiss him. AI also testified that defendant "always tucked me in at night" and always rubbed her leg when he tucked her in. She testified that one night he rubbed her leg until he forced her legs apart and touched her vagina.

The trial testimonies of the victims demonstrated that defendant engaged in predatory conduct for the primary purpose of eventually making them victims of his sexual assaults. He used activities like cuddling on the couch, rubbing their stomachs, taking them on drives, tucking them into bed, and kissing them, over an extended period leading up to occasions when he took advantage of the trust that he gained through these activities to commit sexual assaults. In *Huston*, 489 Mich at 462, the Michigan Supreme Court stated:

> Thus, to give meaning to the entirety of MCL 777.40(1), and out of recognition that 15 points for "predatory conduct" constitutes the highest number of points available under OV 10 and that "preoffense conduct" is being used to define "predatory conduct," we conclude that the latter term does not encompass *any* "preoffense conduct," but rather only those forms of "preoffense conduct" that are commonly understood as being "predatory" in nature, e.g., lying in wait and stalking, as opposed to purely opportunistic criminal conduct or preoffense conduct involving nothing more than run-of-the-mill planning to effect a crime or subsequent escape without detection. [Quotation marks and citation omitted.]

Defendant's conduct fits within the definition of predatory conduct such as "lying in wait and stalking" because defendant interacted with and gained the trust of the victims over a period of

years to enable him to get close to them and sexually assault them during the same activities that they grew to feel "normal" or "safe" with him. A preponderance of the evidence supports the trial court's conclusion that defendant acted in a predatory manner with his victims and the court properly assessed defendant 15 points for OV 10 for each of his convictions.

For its sentencing determination, the trial court considered factors that were not considered under the guidelines variables. The court analyzed whether a departure sentence is more proportionate than a sentence within the guidelines. A sentencing court may consider both "factors not considered by the guidelines" and "factors *considered* by the guidelines but *given inadequate weight*." *Dixon-Bey*, 321 Mich App at 524-525 (emphasis added). The trial court explained that the assessment of the maximum 15 points for OV 10 lacked adequacy because it did not account for the fact that defendant "completely shattered" the trust the victims placed in him. The trial court's departure sentence was reasonable and proportionate to the seriousness of the offenses and the offender because the guidelines did not adequately consider the lengthy grooming of the victims, the impact that his sexual assaults had on the victims, or the seriousness of the crimes committed repeatedly against multiple victims. See *Milbourn*, 435 Mich at 657. The trial court imposed its departure sentence because the guidelines did not adequately factor in several aspects of defendant's conduct and offenses in this case. Under the circumstances presented in this case, the trial court crafted appropriate sentences. See *Dixon-Bey*, 321 Mich App at 525. The trial court's upward-departure sentence did not violate the principle of proportionality.

Defendant argues that there is no "sound strategic reason" for an attorney to want their client to be sentenced under inflated guidelines. However, a preponderance of the evidence supported the trial court's assessment of 15 points for OV 10. See *Osantowski*, 481 Mich at 111. The trial court, therefore, did not err in its guidelines scoring. Further, the sentences imposed by the trial court were reasonable and proportionate to the seriousness of the offenses and the offender. Trial counsel's failure to object to the scoring of OV 10 did not violate defendant's right to effective assistance of counsel. Counsel was not required to make a meritless objection. See *LeBlanc*, 465 Mich at 579; *Fike*, 228 Mich App at 182. Accordingly, defendant is not entitled to resentencing.

IV. PRESENTENCE INVESTIGATION REPORT

Defendant also argues that the references to his acquitted CSC-I charge should have been removed from his PSIR, and therefore, trial counsel violated his right to effective assistance by not objecting to the inclusion of that information. Because defendant has not raised this issue of ineffective assistance of counsel before the trial court, we review this issue for mistakes apparent on the record. *Jackson*, 292 Mich App at 600.

In *People v Armstrong*, 490 Mich 281, 290; 806 NW2d 676 (2011), our Supreme Court explained that a defendant must first show that "counsel's performance fell below an objective standard of reasonableness," and "overcome the strong presumption that counsel's assistance constituted sound trial strategy." Second, a defendant must show that "but for counsel's deficient performance, a different result would have been reasonably probable." *Id*. This Court stated in *People v Lloyd*, 284 Mich App 703, 705; 774 NW2d 347 (2009), that "[t]here is a presumption that the information contained in the PSIR is accurate unless the defendant raises an effective

-10-

challenge." In *Morales v Mich Parole Bd*, 260 Mich App 29, 45-46; 676 NW2d 221 (2003), this Court explained the purpose of a defendant's PSIR:

> The presentence investigation report is an information-gathering tool for use by the sentencing court. Therefore, its scope is necessarily *broad*. A judge preparing to sentence a defendant may consider comments made by the defendant to the probation officer during the presentence interview in addition to evidence adduced at trial, public records, hearsay relevant to the defendant's life and character, and other criminal conduct for which the defendant has not been charged or convicted.

> The Michigan Court Rules provide that the presentence investigation report must include "a complete description of the offense and the circumstances surrounding it, . . . information concerning the financial, social, psychological, or physical harm suffered by any victim of the offense, . . . any statement the defendant wishes to make . . . [and] *any other information* that may aid the court in sentencing." To ensure accuracy, the defendant must be given an opportunity to review his presentence investigation report before sentencing. [Citations omitted and emphasis added; see also MCR 6.425(A).]

Acquitted charges cannot be considered during sentencing. *People v Beck*, 504 Mich 605, 608-609; 939 NW2d 213 (2019). But "a sentencing court may review a PSIR containing information on acquitted conduct without violating *Beck* so long as the court does not rely on the acquitted conduct when sentencing the defendant." *People v Stokes*, 333 Mich App 304, 311; 963 NW2d 643 (2020).

> A sentencing court that reviews a PSIR that merely contains information about acquitted conduct . . . does not necessarily rely on such information when sentencing a defendant. There must be some evidence in the record that the sentencing court relied on such information to warrant finding a *Beck* violation. [*Id*. at 311-312.]

In this case, the jury acquitted defendant of one count of CSC-I. Defendant's PSIR narrative contains information regarding MS's testimony about an incident when defendant touched her vagina while they were on the couch, with a note that: "*This action would be listed as charged behavior under Count 4: Criminal Sexual Conduct 1st Degree (Person Under Thirteen, Defendant 17 Years Of Age or older).*" Defendant's PSIR also lists the CSC-I charge under a section labeled "Final Charges." During sentencing, the trial court emphasized that it did not consider any acquitted conduct for deciding defendant's sentence. Defendant has presented nothing that demonstrates that the trial court did not do as it stated on the record.

Defendant's trial counsel's performance did not fall below an objective standard of reasonableness by not objecting to the information about defendant's acquitted conduct in the PSIR. See *Armstrong*, 490 Mich at 290. The purpose of a PSIR is to include broad information about any and every aspect of a defendant's "life and character," including "criminal conduct for

-11-

which the defendant has not been charged or convicted." *Morales*, 260 Mich App at 45-46. This Court stated in *People v Brown*, 339 Mich App 411, 421-422; 984 NW2d 486 (2021):

> [T]he jury does not make an affirmative finding of innocence when it acquits a defendant of a particular charge . . . when a jury acquits a defendant on a particular charge, the jury does not conclude that the defendant is factually innocent of that charge; rather, it simply finds that the prosecutor failed to prove one or more of the elements beyond a reasonable doubt.

The fact that the jury acquitted defendant of the CSC-I charge does not entitle him to the deletion from his PSIR of all references to the conduct behind the charge because the PSIR is an "information-gathering tool" that must include all relevant information related to defendant's case. *Morales*, 260 Mich App at 45-46. Further, defendant's argument that the charge should be removed from the "Final Charges" section of the PSIR lacks merit because the charged offense was relevant information related to his case that should be included. See *id.*

Even if trial counsel's performance fell below an objective standard of reasonableness, defendant has failed to establish the existence of a reasonable probability that a different sentencing result is likely. See *Armstrong*, 490 Mich at 290. Although the information in the PSIR is available to be used by the sentencing court, acquitted conduct cannot be used during sentencing. In this case, the trial court explicitly stated during sentencing that "the Court is not calculating into any part of my sentence today conduct for which Defendant has been acquitted at trial." See *Beck*, 504 Mich at 608-609. Defendant cannot establish that his sentence would have differed even if trial counsel had objected to the inclusion of acquitted conduct in his PSIR and the trial court had deleted that information. The record reflects that the trial court did not base its sentence on the acquitted conduct. See *Stokes*, 333 Mich App at 311-312. Defendant, therefore, has failed to show that, but for counsel's deficiency, there may have been a different outcome. See *Armstrong*, 490 Mich at 290. Trial counsel's failure to object to the inclusion of acquitted conduct in defendant's PSIR did not violate defendant's right to effective assistance of counsel. Accordingly, defendant is not entitled to resentencing.

Affirmed.

/s/ Brock A. Swartzle
/s/ James Robert Redford
/s/ Christopher P. Yates

-12-